In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 12-2157, 12-2257, 12-2262

KEVIN B. MCCARTHY, *et al.*,

   *Plaintiffs-Counterclaim Defendants-Appellants/Appellees*,

and

LANGSENKAMP FAMILY APOSTOLATE, *et al.*,

   *Counterclaim Defendants-Appellants/Appellees*,

*v.*

PATRICIA ANN FULLER, *et al.*,

   *Defendants-Counterclaimants-Appellees/Appellants.*

Appeals from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:08-cv-00994-WTL-DML—**William T. Lawrence**, *Judge*.

SUBMITTED FEBRUARY 8, 2013—DECIDED APRIL 10, 2013

Before POSNER, WILLIAMS, and SYKES, *Circuit Judges*.

POSNER, *Circuit Judge*. These three interlocutory appeals arise from a complicated and acrimonious litigation, charging RICO, trademark, and copyright violations

along with Indiana torts, that has been percolating in the district court for almost five years. The origins of the litigation go back to 1956, when Sister Mary Ephrem (born Mildred Neuzil), a Catholic Sister of the Congregation of the Sisters of the Most Precious Blood of Jesus (often referred to just as the Congregation of the Sisters of the Precious Blood), had experienced a series of apparitions of the Virgin Mary, in the course of which Mary had told Sister Ephrem (according to the latter's report): "I am Our Lady of America." The Archbishop of Cincinnati (the chapel in which Sister Ephrem experienced the apparitions is, though located in Indiana, under his authority) was convinced of the truth of her report of the apparitions, and with his support an elaborate program of devotions to Our Lady of America was launched. Our Lady has been credited with healing sick people who appealed to her for a cure, although whether either the apparitions or the cures are authentic has not been ruled on by the Congregation for the Doctrine of the Faith, the body within the Roman Catholic hierarchy that is responsible for making such determinations.

Perhaps inspired by her visions, Sister Ephrem joined with other sisters within the Congregation of the Sisters of the Precious Blood in seeking to form a "contemplative cloister"—a "strictly cloistered house for members of the [Congregation] who were principally dedicated to a contemplative life." In 1965 Pope Paul VI approved the creation of the cloister, in New Riegel, Ohio, designating it a "papal enclosure." (We discuss the possible relevance of the designation later.) The New Riegel

cloister lasted until at least 1977, when its three surviving members, including Sister Ephrem and Sister Mary Joseph Therese, left the Congregation of the Sisters of the Precious Blood and formed a new congregation that they called the Contemplative Sisters of the Indwelling Trinity, dedicated to promoting devotions to Our Lady of America.

We should pause to explain that although the parties and the district judge refer to Sister Ephrem and Sister Therese as "nuns," this probably is incorrect. Nuns take what are called solemn vows and live cloistered in convents. Sisters (the full designation is "religious sisters") take what are called simple vows—and those were the vows that both Ephrem and Therese had taken—and can engage in religious and related work outside of convents, although, as we said, both sisters chose like nuns to live the cloistered, convent life. In any event, like nuns and priests, religious sisters are members of religious orders. The amicus curiae brief submitted by the Holy See at our request states that "for the purposes of this brief, the Holy See will not accord significance to any distinction between the terms 'nun' and 'sister.'"

The Contemplative Sisters of the Indwelling Trinity, the congregation founded by Sisters Ephrem and Therese, operates out of Fostoria, Ohio. Sister Ephrem directed it until her death in 2000. She also founded in Fostoria, and directed until her death, an organization that she called Our Lady of America Center. She registered the name with the state of Ohio as a trade name. Sister Therese (referred to in the complaint by her

birth name of Patricia Fuller) succeeded to Sister Ephrem's direction of the two organizations upon the latter's death.

Sister Ephrem willed all her property to Sister Therese. Most of the property—maybe all of it—was related to the devotions to Our Lady of America and had been bought with money donated to the Contemplative Sisters or to the Center. The property included documents, such as Sister Ephrem's diary (which Fuller claims Sister Ephrem had copyrighted, along with a song, a painting, and sculpture, all relating to Our Lady of America), and artifacts that included medallions, plaques, and a statue of Our Lady of America. Sister Therese trademarked a number of the artifacts upon assuming direction of the Contemplative Sisters and the Center.

In 2005 Kevin McCarthy, a lawyer and Catholic layman, and Albert H. Langsenkamp, who claims (whether truthfully or not is in dispute) to be a Papal Knight of the Holy Sepulcher, approached Fuller and offered to help her with the devotions to Our Lady of America. She accepted their offer and the three worked together until 2007, when they had a falling out that erupted the following year into this bitter lawsuit. Langsenkamp established the Langsenkamp Family Apostolate in Rome City, Indiana, the site of the chapel in which the Virgin Mary is alleged to have appeared to Sister Ephrem. Vigorously seconded and assisted by McCarthy, Langsenkamp claims to be the authentic promoter of devotions to Our Lady of America and to be entitled to possession of the documents and artifacts.

McCarthy and Langsenkamp brought this suit against Fuller charging all manner of tortious conduct, including

conversion (theft) of both physical and intellectual property, fraud, and defamation. Fuller counterclaimed vigorously, accusing them of the same things, including theft of the statue of Our Lady of America and of the website of Our Lady of America Center, and of defaming her by calling her a "fake nun." She joined Langsenkamp's Apostolate as an additional counterclaim defendant, though this was really a third-party claim since the Apostolate was not a party to the litigation until Fuller named it as a defendant in her counterclaims. There are other parties to both the complaint and the counterclaims, but they are peripheral and we can ignore them. To simplify, we'll generally refer to just McCarthy as the plaintiff and Fuller as the defendant-counterclaimant. Both seek damages and equitable relief.

McCarthy argues that not only did he and Langsenkamp not steal property of Fuller, but that the property in dispute belongs to the Congregation of the Sisters of the Precious Blood of Jesus because, among other things, having taken a vow of poverty Sister Ephrem did not own and so could not bequeath to Fuller any of the property in question. McCarthy has no authority to litigate on behalf of the Congregation, but he can argue that Fuller's charge that he stole from her fails because she was the thief.

He contests the claim of defamation by denying (among other things) that he lied in saying Fuller is not a nun. Whether or not that's accurate (given the uncertainty that we noted concerning the precise meaning of "nun" in the Catholic religion), calling her a "fake nun"

could readily be understood to deny that she had any religious vocation whatsoever—and in fact McCarthy does deny this, and obtained from the Apostolic Nunciature of the Holy See a statement that Fuller is no longer either a nun or a religious sister. Located in the Vatican, the Holy See is the central governing body of the Roman Catholic Church, and the Apostolic Nunciature is the Holy See's diplomatic mission to the United States.

McCarthy asked the district judge to take judicial notice of (and thus defer to) the Apostolic Nunciature's statement of the Holy See's ruling on Fuller's status in the Church. McCarthy's ground was that the court, being a secular body, could not reexamine the Holy See's ruling but must accept it as authoritative. The judge refused, precipitating appeal No. 12-2257, the only appeal we need to consider at length.

The appeal is interlocutory, but is within our appellate jurisdiction under the collateral order doctrine declared in *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 546-47 (1949) (Jackson, J.). The doctrine allows an interlocutory appeal that challenges a lower-court ruling (final in that court—rather than a tentative order that the district judge might decide to revisit in the course of the litigation) that will harm the appellant irreparably if the challenge is postponed to an appeal from the final judgment, and that can be adjudged correct or incorrect without a further evidentiary hearing.

Conventional formulations of the doctrine typically add another requirement: that the ruling sought to be

appealed have "resolve[d] an important issue *completely separate* from the merits of the action." *Will v. Hallock*, 546 U.S. 345, 349 (2006) (emphasis added). But "completely" is an overstatement, since the principal current application of the doctrine is to appeals from denials of official immunity. See, e.g., *Mitchell v. Forsyth*, 472 U.S. 511, 525-30 (1985); *Apostol v. Gallion*, 870 F.2d 1335, 1338 (7th Cir. 1989). Like the protection conferred on criminal defendants by the double jeopardy clause, *United States v. Kashamu*, 656 F.3d 679, 682 (7th Cir. 2011), or on foreign governments by sovereign immunity, *Abelesz v. Magyar Nemzeti Ban*k, 692 F.3d 661, 667 (7th Cir. 2012), the immunity conferred by the doctrine of official immunity is immunity from the travails of a trial and not just from an adverse judgment. If the defense of immunity is erroneously denied and the defendant has to undergo the trial before the error is corrected he has been irrevocably deprived of one of the benefits—freedom from having to undergo a trial—that his immunity was intended to give him. That satisfies the requirement that to be appealable as a collateral order the order must (unless reversed) wreak irreparable harm on the appellant.

Now often the question of immunity concerns the same conduct of the defendant that the suit challenges as unlawful, rather than being "completely separate." That may be why the issue of immunity is required only to be "conceptually distinct" from the merits, *Mitchell v. Forsyth, supra*, 472 U.S. at 527, rather than literally "completely separate" from them. As the Court explained in that case, if "any factual overlap between a collateral

issue and the merits of the plaintiff's claim is fatal to a claim of immediate appealability, none of these matters could be appealed, for all of them require an inquiry into whether the plaintiff's (or, in the double jeopardy situation, the Government's) factual allegations state a claim that falls outside the scope of the defendant's immunity. There is no distinction in principle between the inquiry in such cases and the inquiry where the issue is qualified immunity . . . . [M]eritorious double jeopardy and absolute immunity claims are necessarily directly controlling of the question whether the defendant will ultimately be liable. Indeed, if our holdings on the appealability of double jeopardy and absolute immunity rulings make anything clear it is that the fact that an issue is outcome determinative does not mean that it is not 'collateral' for purposes of the *Cohen* test." *Id*. at 529 n. 10. We add the further condition that the error be determinable without an evidentiary hearing simply as a reminder that appellate courts don't conduct such hearings.

The conditions for collateral order review are satisfied with respect to appeal No. 12-2257. The district judge's ruling challenged by the plaintiffs is closely akin to a denial of official immunity. A secular court may not take sides on issues of religious doctrine. *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 132 S. Ct. 694, 702-07 (2012); *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 708-20 (1976); *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 115-16 (1952); *Askew v. Trustees of General Assembly of Church of the Lord Jesus Christ of the Apostolic Faith Inc.*, 684 F.3d 413, 415 (3d Cir. 2012).

The district judge in this case has ruled that a federal jury shall decide whether Patricia Fuller is a member of a Roman Catholic religious order, though if the jury decides that she is it will be rejecting the contrary ruling of the religious body (the Holy See) authorized by the Church to decide such matters.

A secular court must be allowed to decide, however, whether a party is correct in arguing that there is an authoritative church ruling on an issue, a ruling that removes the issue from the jurisdiction of that court. *Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1039 (7th Cir. 2006); *Serbian Eastern Orthodox Diocese v. Milivojevich*, *supra*, 426 U.S. at 715-16 and n. 9; Steffen N. Johnson, "Expressive Association and Organizational Autonomy," 85 *Minn. L. Rev.* 1639, 1650 (2001). (One of our holdings in *Tomic* was disapproved in the *Hosanna-Tabor* case, but the disapproved holding is unrelated to the holding for which we just cited *Tomic*.) But once the court has satisfied itself that the authorized religious body has resolved the religious issue, the court may not question the resolution.

It is true that the error of the secular court—of the district court in this case—in deciding that whether Fuller is a member of a religious order is a proper question to put to a jury, allowing the jury to disregard the ruling by the Holy See, can in principle be corrected on appeal from a final judgment. But practice and principle are likely to diverge in this case. Suppose the religious question on which the jury was (wrongly) allowed to rule turned out not to be germane to the

appeal, or that there was no appeal. Then there would be a final judgment of a secular court resolving a religious issue. Such a judgment could cause confusion, consternation, and dismay in religious circles. The commingling of religious and secular justice would violate not only the injunction in *Matthew* 22:21 to "render unto Caesar the things which are Caesar's, and unto God the things that are God's," but also the First Amendment, which forbids the government to make religious judgments. The harm of such a governmental intrusion into religious affairs would be irreparable, just as in the other types of case in which the collateral order doctrine allows interlocutory appeals.

That no religious institution is a party to this case is of no moment. McCarthy is asking us to reverse a district judge's ruling that if it stands will require a jury to answer a religious question. (He has standing to challenge the ruling because it bears directly on his claim.) Religious questions are to be answered by religious bodies. So we asked the Holy See to advise us on the matter, and in response it has filed a 51-page amicus curiae brief which concludes that Fuller, since leaving the Congregation of the Sisters of the Precious Blood in 1979 (or at the very latest since 1983), has not been a member of any religious organization recognized by the Holy See. She is not a nun (she may never have been one, as we noted earlier), not a member of the Catholic Sisterhood or of any Catholic religious order, and not entitled under Catholic law to call herself Sister Therese.

As the Holy See's brief explains, Fuller had become a member of the Congregation of the Sisters of the Precious

Blood in 1965, entering the contemplative cloister that we mentioned earlier. In 1970 she professed perpetual vows of poverty, chastity, and obedience. But in 1977 the Superior General of the Congregation ordered her to take a leave of absence from the cloister for at least a year because of her "seeming satisfaction with minimum spiritual growth and . . . overconcern for externals and physical comfort and niceness," "efforts to control and dominate over the other members of the community," and "disregard for congregational policies and procedures." Four days later she and two other sisters, including Sister Ephrem, petitioned the Superior General for "separation" from the Congregation. They wanted to form their own community—the Contemplative Sisters of the Indwelling Trinity—and went ahead and did so.

The Holy See rejected their petition for separation the following year, on the ground that three was "too small [a number of sisters] for a well-formed community" and in addition that their proposal for the new community "lack[ed] the distinctive charism [calling or aptitude for a religious career] and way of life required for the approval of a religious institute." However, the Holy See reminded the Congregation of the Sisters of the Precious Blood that the sisters could petition for "exclaustration," which means permission to live outside a cloister while remaining a member of a religious order, in this case the Congregation of the Sisters of the Precious Blood. Sister Therese petitioned in 1979 for a one-year exclaustration, which was granted, as was her petition the following year for a second one-year exclaustration. But the Holy See told her there would be no further

extensions—that when the second one expired she would either have to return to the Congregation of the Sisters of the Precious Blood "and live fully under obedience to the superior general," or have to "request a dispensation from your vows and separate yourself from your Congregation." The Holy See gave her till May 31, 1981, to decide. She did not respond, and the following year the Holy See, at the request of the Congregation, dispensed her from her vows and dismissed her from the Congregation on the ground of "incorrigible disobedience." A year later the Holy See advised the Congregation that Fuller "has not made any recourse, so the case is closed."

So matters stood until 2008, when a bishop of the diocese in which Fostoria is located wrote Fuller—apparently at McCarthy's prompting—inquiring about her "state of life in the Church." She replied to the bishop that she remained a member of a religious order under canon law, presumably referring to the Contemplative Sisters of the Indwelling Trinity. Unpersuaded, the bishop issued a statement in which he said that Fuller "is not a member of a canonical institute of consecrated life, having been dismissed from the Society of the Precious Blood community in 1982."

Three years later the Congregation for Institutes of Consecrated Life, the branch of the Holy See responsible for supervision of "religious Institutes," a category that would include both the Congregation of the Sisters of the Precious Blood and the Contemplative Sisters of the Indwelling Trinity, endorsed the following declara-

tion by Archbishop Joseph W. Tobin—the Archbishop Secretary of the Congregation for Institutes of Consecrated Life: "Miss Patricia Ann Fuller is not a member of any religious Institute, formally recognized by the Catholic Church." In March 2012 the Apostolic Nunciature, speaking for the Holy See, confirmed the authority of the archbishop's declaration and requested "that the United States of America and its courts accord full faith and credit to" it.

The question of Fuller's religious status relates to several issues in the litigation. We mentioned her allegation that McCarthy defamed her by calling her a "fake nun," while as part of his claim of fraud he alleges that she misrepresented herself as being a nun and living in a convent. She challenges the Holy See's rulings with the claim that she professed "private vows" back in 1979 and as a result of these vows has "remain[ed] a permanently professed religious sister of the Catholic Church, in private vow, to the present day." She argues that even if she was dismissed from her congregation she is entitled to refer to herself as a sister because the term may be used by a lay person who takes a private vow. The Catholic Church rejects the argument. The Holy See's brief states that "Fuller was neither a nun nor a sister in the Catholic Church once she was dispensed from her religious vows and dismissed from her religious order on August 11, 1982."

Fuller also argues that the Contemplative Sisters of the Indwelling Trinity, as the successor to the contemplative cloister established in 1963, is a papal enclosure, a term

that usually denotes a strictly cloistered existence, as of a nun. But once again, insofar as she is simply disagreeing with the Holy See's denial that she is a nun or a sister, the federal judiciary has no authority to entertain the argument. She further argues that Archbishop Tobin's ruling that Fuller has belonged to no Catholic religious order since her expulsion from the Congregation of the Sisters of the Precious Blood was based on forged documents submitted to him by McCarthy—who indeed, she claims, has been engaged in an orgy of forgery in his effort to place control over all devotions to Our Lady of America in the hands of Langsenkamp's Apostolate. But again this argument cannot prevail in the face of the Holy See's ruling, communicated to us by the amicus curiae brief.

Yet the district judge, rejecting McCarthy's motion to take judicial notice of Archbishop Tobin's ruling on Fuller's religious status, said that McCarthy hadn't demonstrated that either the archbishop or the Congregation for Institutes of Consecrated Life "has the authority to make any such 'decision,'" that is, a decision regarding Fuller's religious status. Later, after the Apostolic Nunciature's statement, confirming the archbishop's ruling, in March 2012, he said that "because the Catholic Church is not a party to this case, . . . if the jury ultimately decides that Fuller is a Catholic nun, that decision simply will not affect the Catholic Church in any way." He added "that the determination set forth in the [archbishop's] Declaration was not made as a result of an adjudication made for religious or church governance purposes." The judge also noted disapprov-

ingly that it was McCarthy who had requested the arch-bishop to declare Fuller's religious status.

In other words, the judge neither could see how the Catholic Church could be harmed by allowing a jury to determine Fuller's religious status nor was satisfied that the Church's determination was valid, in the sense of being both consistent with canon law and procedurally regular. The judge's first reason was, as we said, erroneous; submitting the question of Fuller's religious status to a jury would undermine the authority and autonomy of the Church. His second reason—his concern with validity—has been laid to rest by the amicus curiae brief, which the judge didn't have the benefit of. The brief is the unquestionably authentic statement of the Holy See. In it the Holy See has spoken, laying to rest any previous doubts: Fuller has not been a member of any Catholic religious order for more than 30 years. Period. The district judge has no authority to question that ruling. A jury has no authority to question it. We have no authority to question it.

All that this means, however, so far as the litigation is concerned, is that Fuller's religious status is no longer a litigable issue. She is not a member of any Catholic religious order, and hasn't been since 1983 at the latest, when she exhausted her remedies within the Church by failing to seek "recourse" from her expulsion by the Holy See from the Congregation of the Sisters of the Precious Blood. At any point in the trial or other pro-ceedings at which her religious status becomes relevant to a legal issue, the judge must instruct the lawyers, and

if there is a jury the jurors as well, that the Roman
Catholic Church has determined that Fuller has not been
a member of any Catholic religious order since 1983 at
the latest; that she is not a nun or a sister and does not
live in a convent, cloister, or other religious property
owned or used by the Church; and that these rulings by
the Church may not be questioned in the litigation.

What bearing the rulings have on particular charges
and countercharges is for the district court to decide in
the first instance. Obviously it is relevant to the plain-
tiff's charge of fraud, though not necessarily determina-
tive, as Fuller may try to prove that she believed, albeit
erroneously, that she remained a sister after her expul-
sion by the Congregation of the Sisters of the Precious
Blood. But she will not be permitted to argue or offer
evidence that she *is* a sister. The Holy See's ruling has
removed that issue from the litigation.

This completes our analysis of the principal appeal.
We turn briefly to the other two appeals. One of them
(No. 12-2157) is really two appeals. It challenges the
district judge's denial of McCarthy's motion for a stay
pending resolution of a petition to the Holy See asking it
to determine that the disputed property belongs to the
Church, rather than to Fuller, because of Sister Ephrem's
vow of poverty. That challenge became moot when the
Holy See declined to decide who owned the disputed
property, and so dismissed the petition.

But the appeal also challenges the judge's denial of a
motion by McCarthy for partial summary judgment
that the district court "lacks jurisdiction to make or con-

duct a factual inquiry into the status/ownership of ecclesi-astical property." The district judge denied the motion on the ground that the property dispute can be resolved without getting into religious questions. That may indeed be possible. Conceivably the court might hold, for example, that even if Fuller obtained title to the property in question (the religious artifacts, etc.) upon Sister Ephrem's death, she cannot prove conversion because (McCarthy may be able to prove) she voluntarily gave the property to McCarthy and Langsenkamp. The Holy See's brief expresses doubt that resolution of the property disputes will entangle the district court in religious issues, and if they will not there is no basis for renouncing judicial jurisdiction over the disputes. See *Jones v. Wolf*, 443 U.S. 595, 604 (1979); *Presbytery of Ohio Valley, Inc., v. OPC, Inc.*, 973 N.E. 2d. 1099, 1105-07 (Ind. 2012); *Serbian Orthodox Church Congregation of St. Demetrius v. Kelemen*, 256 N.E. 2d 212, 216-17 (Ohio 1970). Unless and until such entanglement looms, there is no basis for the relief sought by McCarthy; and so we dismiss appeal No. 12-2157 as premature.

The remaining appeal, No. 12-2262, filed by Fuller, seeks to overturn some of the district judge's rulings. These are not final rulings and Fuller did not obtain a Rule 54(b) certification authorizing an interlocutory appeal. Nor is there any other basis for jurisdiction over the appeal.

So, to conclude, the district court's denial of McCarthy's motion that the court take judicial notice of the Holy See's rulings on Fuller's status in the Church—the denial

appealed from in appeal No. 12-2257—is reversed, with a reminder to the district court that federal courts are not empowered to decide (or to allow juries to decide) religious questions. The other two appeals are dismissed.