In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-1238

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

SAGARSEN HALDAR,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 10-CR-268 — **Rudolph T. Randa**, *Judge.*

ARGUED DECEMBER 3, 2013 — DECIDED APRIL 30, 2014

Before POSNER, MANION, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* A jury found Sagarsen Haldar guilty of conspiring to defraud the United States by using his position as leader of a Hare Krishna temple in Milwaukee to obtain religious-worker visas for people who were not actually religious workers. Haldar appeals his conviction and seeks a new trial by raising three issues, none of which he raised in the district court. He argues: (1) certain statements from the prosecutor and a government witness improperly called into

question the validity of his temple and were unfairly prejudicial under Federal Rule of Evidence 403; (2) the prosecutor misrepresented testimony during his closing argument and relied on facts outside the record; and (3) the district court on its own initiative should have instructed the jury not to scrutinize the religious qualifications of the visa recipients. Haldar cannot satisfy the stringent "plain error" standard that he must meet to win a new trial when raising such issues for the first time on appeal. We affirm his conviction.

I.   *Factual and Procedural Background*

Haldar is an Indian citizen who came to the United States in 1999 and has been a permanent resident since 2006. A few years after his arrival he founded the Gaudiya Vaisnava Society, Inc., known as GVS-Milwaukee. Gaudiya Vaisnava (or Vaishnava) is another name for the Hare Krishna religion. From 2004 to 2007, GVS-Milwaukee sponsored twenty-five applicants for religious-worker visas known as "R-1 visas," see 8 C.F.R. § 214.2(r)(1), seventeen of which were approved.

For reasons not fully explained in the record, by mid-2007 the State Department had advised the Department of Homeland Security (DHS) that GVS-Milwaukee might be involved in visa fraud. DHS had also received an anonymous tip along the same lines. As a result, the agency began an investigation that included temple visits, surveillance, searches of Haldar's luggage on international trips, and interviews with GVS-sponsored visa recipients. Haldar was charged in 2010 with conspiracy to defraud the United States under 18 U.S.C. § 371.

At trial, DHS agents testified about their investigation. One agent, Ali Lubbad from the fraud detection arm of U.S.

Citizenship and Immigration Services (USCIS), described the investigation's inception and initial stages. He mentioned the State Department's suspicions of visa fraud and that DHS had received a tip about GVS-Milwaukee. As he was about to describe the content of the tip, defense counsel objected to the testimony as hearsay. Before the judge could rule, the prosecutor interjected, "Actually I think I can take care of it this way. Without going into the substance of the letter, is it fair to say you received a tip letter that indicated that you should look into GVS?" Lubbad responded, "Yes."[1] Haldar's lawyer did not renew his hearsay objection or object to this testimony on another basis.

Agent Lubbad also told the jury that, in any event, DHS routinely investigates organizations sponsoring R-1 visa applicants because up to 33 percent of all applications are sponsored by "[c]ompletely fraudulent" organizations, meaning there was actually "no organization" at all. Defense counsel did not object to Lubbad's testimony on this point.

Agent Lubbad went on to describe a surprise visit he made to the main GVS temple location. During that visit, Haldar seemed anxious for him to leave because no religious activity

---

[1] Although Haldar does not raise the hearsay problem with Lubbad's testimony on appeal, such "course of investigation" evidence is only rarely relevant. When the prosecution offers this type of testimony, it invites witnesses to give inadmissible hearsay and invites appellate courts to reverse on evidentiary or Confrontation Clause grounds. See *Jones v. Basinger*, 635 F.3d 1030, 1044–48 (7th Cir. 2011) (ordering habeas corpus relief where "course of investigation" evidence violated defendant's Confrontation Clause rights).

was apparent: "He was encouraging me to leave that location. Kept saying I have another Temple at Ramsey. You know, it's better to see. And it seemed—my feeling was that he wanted to leave that location as soon as possible." Following Haldar to the Ramsey Avenue temple location in a separate car, Lubbad saw him talking on his cell phone during the drive. Lubbad testified that he thought the people he encountered at the Ramsey location, who were loudly performing music, looked as if they were expecting a visit. Haldar's lawyer objected to this testimony as speculative, to which the prosecutor responded that Lubbad could testify about his own perception of the situation. The court allowed the testimony to stand, and Haldar's lawyer offered no other objection.

Near the end of Agent Lubbad's direct examination, the prosecutor asked how DHS keeps track of organizations that sponsor religious workers. Lubbad answered in part by once more volunteering his statistic about the rate of fraud in R-1 visa applications, this time saying that "a very significant 33 percent [of applications] were – had some elements of fraud in them." Again Haldar's lawyer made no objection.

Another agent from DHS, Scott Engelhardt, who became involved with the investigation after it was transferred from USCIS to U.S. Immigration and Customs Enforcement (ICE), testified that he twice supervised the inspection of Haldar's luggage at O'Hare Airport when Haldar returned from trips to India. The luggage contained completed R-1 visa applications and supporting documents, including numerous passports, letters to U.S. consulates, and training certificates that Haldar had signed. Engelhardt also testified that he interviewed three R-1 visa recipients sponsored by GVS-Milwaukee who were

working in secular jobs rather than for Haldar or GVS-Milwaukee or any other religious organization. These men, Engelhardt explained, agreed to cooperate with the investigation.

The testimony of the three visa recipients, along with covert audio recordings of two meetings one of them had with Haldar, formed the heart of the government's case. All three men testified that Haldar had agreed to help them obtain visas in exchange for payments ranging from $20,000 to $30,000. He had then fulfilled his end of the bargain by making GVS-Milwaukee their sponsoring organization and arranging for them to be provided with training certificates and other supporting documents by a colleague in India. The visa recipients also testified that—although they had received enough training before leaving India to enable them to pass for Hare Krishna priests if interviewed by U.S. officials—they had always intended, as Haldar knew full well, to work in secular jobs in the United States.[2]

The recordings were made when one of the visa recipients, Gurpreet Singh, wore a recording device to two meetings with Haldar. According to the translated transcript of the first meeting, Singh explained to Haldar that his visa would soon expire and he needed help getting an extension. Haldar responded by scolding Singh for having failed to pay all he had promised for the visa: "You people did not pay my money … it has been such a long time. … You should just think

---

[2]  A person need not be a priest or minister in his or her religion to receive an R-1 visa, but the visa applicants here pretended to be priests. "Religious worker" is a broader category, though the requirements for qualifying are quite demanding. See 8 C.F.R. §§ 214.2(r)(1)(iii), (r)(3).

about … what a difficult job for me it was to get your job done. …You should have paid my money … I have asked so many times for it." Singh promised to pay Haldar what he already owed and also to pay more for the visa extension. He then gave Haldar $500. Haldar laughed and said, "You owe me $10,000 and you are paying me $500 only," but he agreed to accept installment payments and to assist with the visa extension. At the second meeting, Haldar accepted another $500 payment.

On cross-examination, Singh and another visa holder, Kashish Chopra, admitted that their removal from the United States had been deferred so that they could testify against Haldar. Chopra also admitted that he had gotten married for the sole purpose of staying in the United States. The third man, Sanjiv Kumar, admitted that he initially denied to investigators that he had ever paid Haldar any money. And all three answered in the affirmative when asked if they would "do anything" to stay in the United States. (None of the three had been charged with a crime when they testified, but none had been promised immunity either.)

In his closing argument, the prosecutor summed up the evidence against Haldar, stressing the recordings and the visa recipients' testimony that Haldar was a party to the fraud. Haldar's lawyer countered that Haldar was himself a victim, deceived by the visa recipients. He argued that the visa recipients' testimony about Haldar's knowledge was not credible. The three could not be believed on any subject, the lawyer contended, because they had admitted on cross-examination that they "would do whatever it takes" to stay in the United States. Yes, he conceded, "This case does involve

fraud. It just doesn't involve fraud on the part of Mr. Haldar. It involves fraud on the part of three guys that got caught and are doing whatever it takes to stay here."

II. *Analysis*

The jury found Haldar guilty, and the district court sentenced him to 37 months in prison. On appeal Haldar argues that three aspects of his trial call for reversal and a new trial. Because Haldar never raised these issues in the district court, he has forfeited any appellate claim based upon them and our review is only for "plain error." A plain error is an error that is obvious, affected the defendant's substantial rights—meaning that the defendant likely would have been acquitted otherwise—and seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *United States v. Jones*, 739 F.3d 364, 368 (7th Cir. 2014). In effect, a finding of plain error says that an error was so obvious and prejudicial that the district judge should have intervened without being prompted by an objection from defense counsel. See *United States v. Alexander*, 741 F.3d 866, 870 & n.1 (7th Cir. 2014).

A. *Questioning the Religious Legitimacy of GVS-Milwaukee*

During his opening statement, the prosecutor said that Haldar "identified himself" as GVS-Milwaukee's founder and president and "held himself out" as holding various other titles. Haldar argues that this unfairly insinuated that he was a charlatan and that GVS-Milwaukee was a sham religious organization. This insinuation was reinforced, Haldar says, by the testimony of Agent Lubbad, who not only said that the people he saw at the second temple location were putting on

a show for him but also suggested a high likelihood of fraud by citing the statistic that one-third of all R-1 visa applications were sponsored by "completely fraudulent" organizations or had "some elements of fraud" in them. Haldar argues that the prosecutor's statements constituted prosecutorial misconduct and that those statements and Agent Lubbad's testimony were substantially more prejudicial than probative, violating Federal Rule of Evidence 403.

Haldar's claim of prosecutorial misconduct is based on his belief that any questioning of GVS-Milwaukee's legitimacy was barred by a promise the prosecutor made before the jury was empaneled. The purported promise came in the context of a request from Haldar's lawyer that potential jurors be asked during voir dire about their religious beliefs and views on religious freedom, with the goal of identifying anyone who might be intolerant of Hare Krishnas. The lawyer explained:

> Hare Krishnas historically in this country have had negative connotation. From movies where they're seen—for example, the movie Airplane. A recurring theme. They've been made fun of. They've been the subject of controversy throughout the 60's, the 70's. And depending upon the age of the jurors they could have various opinions on the Krishnas themselves from prior experience. And I think we at least need to address their understanding of whether or not they have those biases. And a big question at the end of the day is, is this a bona fide religious organization? That's part of the require-ment [for obtaining a religious-worker visa], and I think we're going to get into it.

The judge responded that he did not think the government was disputing whether "the GVS … was an established religious organization," and the prosecutor confirmed, "No, we're not disputing that." The judge then explained that he would ask prospective jurors about any prejudice against the Hare Krishna religion but would not inquire into their religious beliefs.

We accept the premise that a prosecutor who promises not to raise certain issues during trial but nonetheless does so—at least without warning and an opportunity for the defense to object—may engage in misconduct. Cf. *United States v. Melvin*, 730 F.3d 29, 32 (1st Cir. 2013) (prosecutor's use of proffered information at trial after assuring defendant that he would not so use it violated due process). But we cannot conclude that such a promise was broken in this case, let alone that there was a plain error.

First, an assurance regarding GVS-Milwaukee would not necessarily extend to Haldar personally. He was being charged with conspiracy to defraud the United States, so attacks on his sincerity or integrity could not have been a surprise. Second, the prosecutor's statements about Haldar's use of religious titles were not followed by an assertion that he did not hold those titles; the implication was, at worst, that the prosecutor did not know whether he actually held them. Third, but most important, whether the prosecutor was making an assurance regarding GVS-Milwaukee specifically or about Hare Krishnas in general is not clear from the transcript, but the absence of any objection from Haldar at trial weighs heavily in favor of concluding that the prosecutor broke no promise.

Haldar also argues that the prosecutor's opening statement and Agent Lubbad's testimony were substantially more prejudicial than probative and so should have been excluded under Federal Rule of Evidence 403. Calling into question Haldar's religious sincerity, he contends, inflamed the jurors against him.

Accusations that a person is irreligious or has acted contrary to a religion's teachings can be inflammatory. See, e.g., *Slagle v. Bagley*, 457 F.3d 501, 518 (6th Cir. 2006) (baseless implication from prosecutor that defendant did not pray was designed "to inflame the passions of the jury" but affirming denial of habeas corpus relief); *United States v. Giry*, 818 F.2d 120, 133–34 (1st Cir. 1987) (prosecutor's comparison of defendant's actions "to Peter's denial of Christ" was "an irrelevant and inflammatory appeal to the jurors' private, religious beliefs" but not a plain error). And sometimes such accusations are highly prejudicial, as in *Nichols v. American Nat'l Ins. Co.*, 154 F.3d 875, 885, 890 (8th Cir. 1998), which reversed a defense verdict where the jury learned that the plaintiff had an abortion "even though it was against her religion," a piece of information that "increased the likelihood that the jury would view her as immoral and not worthy of trust and reach its verdict on such basis," requiring a new trial.

But the prosecutor in Haldar's case did not question his faith, nor did the prosecutor criticize the Hare Krishna religion. While the general theme of the prosecution undeniably was that Haldar used his position as the leader of GVS-Milwaukee to carry out the fraud, this theme was not improper. Haldar's misuse of his position was the essence of the crime he was

charged with committing. Nothing the prosecutor said during his opening statement was unfairly prejudicial.

Aspects of Agent Lubbad's testimony are more troubling. Haldar focuses on Lubbad's claim that one-third of R-1 visa applications are fraudulent, his reference to a tip about GVS-Milwaukee, his description of the first temple location he visited as devoid of religious activity, and his stated belief that the people at the second temple were putting on a show for his benefit.

In addition to stressing religion's special inflammatory potential, Haldar argues that Lubbad's testimony was equivalent to the testimony that we found unduly prejudicial in *United States v. Klebig*, 600 F.3d 700, 710 (7th Cir. 2010), where the defendant was charged with firearms offenses and the jury was told that the defendant had a sign on his door warning that nothing inside was "worth dying for." This testimony in *Klebig*, combined with photographs of the defendant's exceptionally cluttered home, had no probative value and instead painted the defendant as a "perhaps unbalanced man" and a "gun nut," inviting the jury to convict him based on fear or dislike rather than the evidence of a crime. *Id.* at 712–13.

Haldar also draws a comparison to *United States v. Wolf*, 787 F.2d 1094, 1098 (7th Cir. 1986), where irrelevant innuendo implied that the defendant in a Mann Act case once had a venereal disease, and to *United States v. DeGeratto*, 876 F.2d 576, 583–86 (7th Cir. 1989), where the defendant, charged with crimes related to the interstate transport of stolen property, was painted as a dangerous loan shark who was also running a prostitution ring. In each case, we concluded that the

insinuations constituted unfairly prejudicial attacks on the defendant's character.

Agent Lubbad's testimony was not as likely to instill fear in the jurors as the testimony in *Klebig* or as likely to inflame them as the testimony about abortion could have in *Nichols*. Nor do we think Haldar's character was maligned unfairly as in *Wolf* and *DeGeratto*. Still, Lubbad's provision of the statistic about R-1 visa fraud was both irrelevant and unfair. "Evidence is unfairly prejudicial if it induces the jury to decide the case on an improper basis rather than on the evidence presented." *United States v. Conner*, 583 F.3d 1011, 1025 (7th Cir. 2009). Telling the jurors that a large proportion of R-1 applications are fraudulent encouraged them to conclude, without any evidence specific to this case, that the applications Haldar sponsored had a strong chance of being fraudulent. The rest of Agent Lubbad's testimony was not especially prejudicial on its own, but book-ended as it was by the irrelevant and prejudicial statistic he provided twice, the testimony did exacerbate the implication that the GVS-sponsored visas were likely to fall into the supposedly massive pool of fraudulent applications. A jury should no more have been told of that pool than it should have been given overall conviction rates for the category of crime that was charged.

The government tries to justify Agent Lubbad's testimony as a hedge against any accusation that the government had unfairly singled out GVS-Milwaukee. No such accusation had been made, though, and the government was playing with fire when it chose to anticipate one with Lubbad's flimsy assertion of the one-third statistic.

Haldar, however, did not object at trial to Agent Lubbad's testimony about the rate of R-1 visa fraud. In fact, he made no relevant objection to any part of Lubbad's testimony. (His objection that Lubbad's description of people at the second temple was speculative and his abandoned hearsay objection to the tip testimony did not preserve any objection based on Rule 403. See, e.g., *United States v. Blount*, 502 F.3d 674, 677–78 (7th Cir. 2007) (an objection on one ground does not preserve a challenge based on another).) As a result, our review is only for plain error, *Jones*, 739 F.3d at 368, and Haldar cannot satisfy that standard.

A finding of plain error requires not only that the error be obvious but that the defendant probably would not have been found guilty if not for the error. *Id.* Considering the testimony of the three visa recipients and the recordings of Haldar seeking payment for R-1 visa sponsorship from a person he knew was not a religious worker, Haldar was highly likely to have been convicted regardless of the statistic Agent Lubbad offered. A defendant is guaranteed a fair trial but not a perfect trial. *Brown v. United States*, 411 U.S. 223, 231–32 (1973); *United States v. Harris*, 271 F.3d 690, 704 (7th Cir. 2001). Agent Lubbad's testimony was not so prejudicial as to amount to a plain error that denied Haldar a fair trial.

B. *Prosecutor's Closing Argument*

Haldar next argues that the prosecutor in his closing argument improperly bolstered the testimony of the visa recipients with evidence not in the record and misrepresented some evidence that was in the record. The prosecutor's purported misconduct is contained in this passage, which

followed the prosecutor's acknowledgment that the visa recipients' testimony was inconsistent on some smaller points:

> In fact, with respect to all of these different types of information, that is the payment of a substantial fee at Haldar's direction, the payment in cash, the payment in India in Rupees, the installments, the no training as a Priest, all of those things, they remain consistent all the way through. They were—that's what the witnesses told the Agents the first time they met. That's what they testified to here, with the exception of Sanjiv Kumar, who as you heard from him, held back the fact that he had paid for his religious worker Visas. But he never held back on the fact that this was fraud. On that, all these witnesses have been definite from the beginning, and continued to be here at the trial.

Haldar did not object to the prosecutor's closing at the time.

A basic foundation of the law governing federal trials is that lawyers, and especially prosecutors, should not refer to a witness's prior consistent statement if the earlier statement is not in evidence, even though doing so does not automatically call for reversal. See *United States v. Tucker*, 714 F.3d 1006, 1013 (7th Cir. 2013). The extra-record statements that Haldar contends the prosecutor referred to are from the witnesses' grand jury testimony, very little of which was introduced at trial. But Haldar's reading of the prosecutor's words is unnatural. The prosecutor's explicit reference to the visa recipients' interviews with DHS agents made clear that the consistency he was stressing was between those interviews, which the jury

heard about, and the trial testimony. There was no misconduct here, let alone misconduct that could support a finding of plain error.

Like any other lawyer, a prosecutor is also obliged to avoid misrepresenting the evidence that *was* presented to the jury. *United States v. Wolfe*, 701 F.3d 1206, 1214 (7th Cir. 2012). Haldar contends that the prosecutor misstated the evidence in his case by telling the jury in his closing argument that the visa recipients agreed that "this was fraud" and that they had received "no training" to be priests. The witnesses, Haldar points out, never used the word "fraud" themselves, and they explained that they were at least trained how to behave like priests.

Considering the prosecutor's statements in context, see *United States v. Roe*, 210 F.3d 741, 747 (7th Cir. 2000), we conclude that he did not misrepresent the visa recipients' testimony. Although the witnesses did not say "fraud," even Haldar's lawyer candidly acknowledged in his own closing argument that what they described was fraud. The prosecutor's argument was certainly fair comment on the evidence. And the prosecutor's "no training" statement, while not precise, was a permissible shorthand reminder of the witnesses' testimony that their training was meant to enable them only to *pass* for priests rather than to *work* as priests. Again, we find no prosecutorial misconduct.

C.  *Instruction on Religious Qualifications*

Haldar never asked the court to instruct the jury that the visa recipients were qualified religious workers, but he argues now that the lack of such an instruction is reversible error. He

relies in part on our decision in *McCarthy v. Fuller*, 714 F.3d 971
(7th Cir. 2013), where we reversed a district court's ruling that
a jury could decide whether the defendant was a member of a
Roman Catholic religious order. The church denied that the
defendant was a member of a religious order, and we held that
"once the court has satisfied itself that the authorized religious
body has resolved the religious issue, the court may not
question the resolution." *Id.* at 976. Haldar also cites *Hosanna-
Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 132 S.Ct. 694
(2012), which recognized the implied "ministerial exception"
in federal employment discrimination statutes, for the general
proposition that the government cannot choose a church's
ministers. Notably, Haldar cites no case requiring a court to
give an instruction about religious qualifications when no such
instruction was requested, and we have found none.

Some of our cases treat a failure to request a jury instruction
as a waiver of any argument that such an instruction should
have been given, see, e.g., *MMG Financial Corp. v. Midwest
Amusements Park, LLC*, 630 F.3d 651, 658 (7th Cir. 2011), while
others consider the argument merely to have been forfeited,
see, e.g., *United States v. Johnson*, 655 F.3d 594, 605 (7th Cir.
2011). But even if we treat Haldar's argument as only forfeited
and subject to plain-error review rather than waived, we find
no error, plain or otherwise. The jury was told to decide
whether Haldar sponsored the visa applicants with the
expectation that they would be religious workers. Performing
that task would have been impossible if an instruction had
required the jurors to accept that the applicants were religious
workers simply because Haldar had managed to obtain
certificates for them. Our analysis would be different if the

jurors had been asked to determine how much training is required to become a Hare Krishna priest or whether the visa recipients had been given enough, but no such questions were posed to them. Haldar has not shown there was any error in the jury instructions.

D. *Cumulative Error*

Haldar's final argument is that even if none of the individual issues he has raised constituted plain error, they satisfy that standard in the aggregate. To win reversal based on a cumulative-error theory, Haldar would need to demonstrate at least two errors and show that in combination they caused his trial to be fundamentally unfair. *United States v. Moore*, 641 F.3d 812, 830 (7th Cir. 2011). Because we have found only one minor error in Haldar's trial (the admission of Agent Lubbad's statistic), we necessarily reject his cumulative-error argument.

The judgment of the district court is AFFIRMED.