In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-3057

EMILY HERX,

*Plaintiff-Appellee,*

*v.*

DIOCESE OF FORT WAYNE–SOUTH BEND,
INC. and ST. VINCENT DE PAUL SCHOOL,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 1:12-cv-00122 RLM — **Robert L. Miller, Jr.,** *Judge.*

SUBMITTED OCTOBER 17, 2014 — DECIDED DECEMBER 1, 2014

Before CUDAHY, WILLIAMS, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* A Catholic school in Fort Wayne, Indiana, discharged a language-arts teacher because she underwent in vitro fertilization in violation of the moral teaching of the Catholic Church. She sued the school and the local diocese alleging that they unlawfully discriminated against her because of her sex and disability. The case comes to us from an order denying the defendants' motion for summary

judgment. Because that decision is nonfinal, the plaintiff has moved to dismiss for lack of appellate jurisdiction. For the reasons that follow, we grant the motion.

## I. Background

In August 2003 Emily Herx began work as a junior-high language-arts teacher at St. Vincent de Paul School in Fort Wayne, Indiana. Her teaching contract was subject to annual renewal. In 2008 Herx and her husband learned that she has a medical condition that causes infertility. She began a course of fertility treatments, starting with artificial insemination. That procedure was unsuccessful, and in March 2010 she underwent in vitro fertilization. Herx told the school's principal about her treatment and was allowed to take time off for it. Herx's contract was renewed again for the 2010–2011 school year.

In April 2011, just as Herx was about to undergo a second round of in vitro fertilization, Monsignor John Kuzmich, the pastor of St. Vincent de Paul Catholic Church, met with Herx and advised her that in vitro fertilization is incompatible with the Catholic Church's moral teaching. Soon after that meeting, the Diocese of Fort Wayne–South Bend notified Herx that because she underwent in vitro fertilization in violation of the Church's moral doctrine, her teaching contract would not be renewed for the 2011–2012 school year.

Herx sued the Diocese and St. Vincent School (collectively, "the Diocese") alleging claims under Title VII of the Civil Rights Act, as amended by the Pregnancy Discrimination Act, *see* 42 U.S.C. § 2000e-2; *id.* § 2000e(k), and the Americans with

Disabilities Act ("ADA"), *see* 42 U.S.C. §§ 12101 *et seq.* She contends that the defendants discriminated against her on the basis of sex and disability by refusing to renew her contract because she underwent in vitro fertilization.

The Diocese moved for summary judgment on both claims. The district court granted the motion with respect to the ADA claim; that ruling is not at issue on this appeal. On the Title VII claim, the Diocese invoked two statutory exemptions available to religious organizations. The first provides as follows:

> This subchapter shall not apply to … a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

42 U.S.C. § 2000e-1(a). The second is specific to religiously affiliated educational institutions and states as follows:

> [I]t shall not be an unlawful employment practice for a school, college, university, or other educational institution or institution of learning to hire and employ employees of a particular religion if such school, college, university, or other educational institution or institution of learning is, in whole or in substantial part, owned, supported, controlled, or managed by a particular religion or by a particular religious corporation, association, or society, or if the curriculum of such school, college, university, or

other educational institution or institution of learning is directed toward the propagation of a particular religion.

*Id*. § 2000e-2(e)(2).

Invoking the exemptions in the context of this case raises a question of first impression in this circuit: Are the religious-employer exemptions in Title VII applicable only to claims of *religious* discrimination or do they apply more broadly to other employment-discrimination claims? Relying on caselaw from other circuits, the district court held that the religious-employer exemptions apply only to claims alleging religious discrimination and do not bar Title VII claims against religious organizations alleging discrimination on the basis of race, color, sex, or national origin. *See e.g.*, *Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 192 (4th Cir. 2011); *Boyd v. Harding Acad. of Memphis, Inc.*, 88 F.3d 410, 413 (6th Cir. 1996); *EEOC v. Pac. Press Publ'g Ass'n*, 676 F.2d 1272, 1279 (9th Cir. 1982).

The Diocese argued in the alternative that if the statutory exemptions do not apply, then Title VII is unconstitutional as applied because the jury would be asked to engage in an impermissible inquiry into the religious teachings of the Catholic Church. The judge was sensitive to this problem. He acknowledged that "[t]he Diocese is understandably concerned about the possibility of a … jury conducting its own secular analysis of Roman Catholic doctrine on in vitro fertilization." He said "[t]hat shouldn't happen" in this case, and he assured the parties that he would instruct the jury not to consider "whether [the Diocese's] actions were wise, reasonable, or fair," but only whether Herx had proved that the Diocese took

an adverse employment action against her because of her sex. FEDERAL CIVIL JURY INSTRUCTIONS OF THE SEVENTH CIRCUIT 3.07 (2010).

The Diocese also argued that the ministerial exception rooted in the religion clauses of the First Amendment barred Herx's claim. *See Hosanna–Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 132 S. Ct. 694 (2012). The judge rejected this argument as well, holding that because Herx was a lay language-arts teacher with no role in religious education at St. Vincent, the ministerial exception did not apply.

Finally, the judge held that a reasonable jury could find the Diocese liable on Herx's sex-discrimination claim. The Diocese said it would discharge *any* employee—male or female—who was found to have violated the Church's teaching against in vitro fertilization. In other words, the Diocese requires all employees to abide by the moral standards set by the Church and enforces those standards without regard to sex. The judge concluded that "a jury wouldn't be compelled to accept that avowed gender-neutrality." This was so, the judge held, "[e]ven in the face of … evidence [of gender neutrality] from the Diocese," because "a jury that resolved every factual dispute, and drew every reasonable inference, in Mrs. Herx's favor could infer that Mrs. Herx's contract would have been renewed had she been male and everything else remained the same."

For these reasons, the judge denied the Diocese's motion for summary judgment on the sex-discrimination claim and set a trial date of December 16, 2014.

The Diocese did not ask the court to certify the summary-judgment order for immediate appeal under 28 U.S.C. § 1292(b), as it might have done. *See Kennedy*, 657 F.3d at 191 (approving the district court's § 1292(b) certification in a similar case raising a legal question about the scope of Title VII's religious-employer exemptions). Instead, the Diocese brought this appeal under the auspices of the collateral-order doctrine.

## II. Discussion

The legal and factual merits of this case are not before us. Because the appeal is interlocutory, Herx has moved to dismiss for lack of appellate jurisdiction, arguing that the collateral-order doctrine does not apply. We ordered a response from the Diocese and suspended merits briefing pending disposition of the motion. The response is now in, as is a reply brief from Herx, so the motion is ready for decision.

The federal courts of appeals ordinarily have jurisdiction to review only "final decisions of the district courts." 28 U.S.C. § 1291. But the collateral-order doctrine confers finality—and thus immediate appealability—on a small category of interlocutory orders "too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949). Included in this "small category" are "decisions that are conclusive, that resolve important questions separate from the merits, and that are effectively unreviewable on appeal from

the final judgment in the underlying action." *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 42 (1995).

These three conditions for collateral-order review—(1) a conclusive decision; (2) on an important issue that is conceptually separate from the merits; and (3) that is effectively unreviewable on an appeal from a final judgment—are considered "stringent." *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868 (1994). And they must be kept so lest the collateral-order doctrine "overpower the substantial finality interests § 1291 is meant to further." *Will v. Hallock*, 546 U.S. 345, 350 (2006). These interests include "judicial efficiency … and the 'sensible policy of avoid[ing] the obstruction to just claims that would come from permitting the harassment and cost of a succession of separate appeals from the various rulings to which a litigation may give rise.'" *Id.* (quoting *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 374 (1981)).

The Supreme Court's most recent forays into the collateral-order doctrine are replete with references to the "narrow" and "modest" scope of the doctrine. *See, e.g., Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 106–07 (2009); *Will*, 546 U.S. at 350 ("[W]e have not mentioned applying the collateral order doctrine recently without emphasizing its modest scope."); *Digital Equip.*, 511 U.S. at 868 ("[T]he 'narrow' exception should stay that way and never be allowed to swallow the general rule that a party is entitled to a single appeal, to be deferred until final judgment has been entered … ." (citation omitted)). As if to drive the point home, the Court has issued this blunt reminder to those who seek to expand the scope of collateral-order review: "[W]e have meant what we have said; although

the Court has been asked many times to expand the 'small class' of collaterally appealable orders, we have instead kept it narrow and selective in its membership." *Will*, 546 U.S. at 350.

To determine whether the requirements for a collateral-order appeal are met, we "do not engage in an individualized jurisdictional inquiry." *Mohawk Indus.*, 558 U.S. at 107 (internal quotation marks omitted). Instead, the "focus is on the entire category to which a claim belongs." *Id.* (internal quotation marks omitted).

The recognized categories of collaterally appealable orders include orders rejecting a public official's claim of absolute or qualified immunity, *Nixon v. Fitzgerald*, 457 U.S. 731, 742 (1982) (absolute immunity); *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985) (qualified immunity), as well as orders rejecting a State's claim of Eleventh Amendment immunity, *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144–45 (1993). An order rejecting a foreign government's claim of sovereign immunity also meets the criteria for collateral-order appeal. *See Abelesz v. Magyar Nemzeti Bank*, 692 F.3d 661, 667 (7th Cir. 2012). So does an order denying a criminal defendant's claim of double jeopardy. *See Abney v. United States*, 431 U.S. 651, 660 (1977).

Importantly, these classes of cases involve claims of "immunity from the travails of a trial and not just from an adverse judgment." *McCarthy v. Fuller*, 714 F.3d 971, 975 (7th Cir. 2013). "If the defense of immunity is erroneously denied and the defendant has to undergo the trial before the error is corrected he has been irrevocably deprived of one of the

benefits—freedom from having to undergo a trial—that his immunity was intended to give him." *Id.*

Arguments to extend collateral-order review beyond these few, well-established categories usually fail at the third step in the analysis, which asks whether the challenged order is effectively unreviewable on an appeal from a final judgment. The Supreme Court has explained that at this step the "crucial question … is not whether [the asserted] interest is important in the abstract; it is whether deferring review until final judgment so imperils the interest as to justify the cost of allowing immediate appeal of the entire class of relevant orders." *Mohawk Indus.*, 558 U.S. at 108. The mere fact that "a ruling 'may burden litigants in ways that are only imperfectly reparable by appellate reversal of a final district court judgment … has never sufficed.'" *Id*. at 107 (quoting *Digital Equip.*, 511 U.S. at 872)). Rather, "the decisive consideration is whether delaying review until the entry of a final judgment 'would imperil a substantial public interest' or 'some particular value of a high order.'" *Id.* (quoting *Will*, 546 U.S. at 352–53)).

A common characteristic in cases in which collateral-order review has been permitted is that "[i]n each case, some particular value of a high order was marshaled in support of the interest *in avoiding trial*," not just an interest in avoiding an adverse judgment. *Will*, 546 U.S. at 352 (emphasis added). The interests that meet this high bar include "honoring the separation of powers, preserving the efficiency of government and the initiative of officials, respecting a State's dignitary interests, and mitigating the government's advantage over the individual." *Id*. at 352–53.

The district court's order does not implicate an interest of this kind. This suit involves private parties—not public officials or a unit of government—so delaying appellate review until final judgment does not "imperil a substantial public interest" grounded in the separation of powers, the dignity interests of a State, the efficient operation of the government, or any other public interest. And although the statutory and constitutional rights asserted in defense of this suit are undoubtedly important, the Diocese has not established that the Title VII exemptions or the First Amendment more generally provides an immunity *from trial*, as opposed to an ordinary defense to liability.

Indeed, most of the Diocese's brief in opposition to the dismissal motion consists of an argument attacking the district court's summary-judgment ruling on the merits. On the jurisdictional issue—the only relevant question at this stage—only a few sentences are addressed to the criteria for collateral-order review. The Diocese's primary argument relies on a passage from our opinion in *Korte v. Sebelius*, 735 F.3d 654 (7th Cir. 2013), which construed the Religious Freedom Restoration Act ("RFRA"). In *Korte* the government argued for a narrow construction of RFRA by analogizing to the Title VII exemptions for religious employers. *Id.* at 676–79. We rejected that argument, pointing out that the Title VII exemptions and RFRA are different in important respects. We described the Title VII exemptions as "legislative applications of the church-autonomy doctrine" and explained that this principle—where it applies—"operates as a complete immunity, or very nearly so." *Id.* at 678. We also explained that the Title VII exemptions are "categorical, not contingent," whereas RFRA requires a

balancing of competing interests. *Id.* In other words, where applicable, the religious-employer exemptions in Title VII provide a complete defense to liability without regard to interest balancing; in contrast, the rights protected by RFRA can be overcome by "a sufficiently strong governmental interest." *Id.* at 679.

The Diocese reads our "complete immunity" and "categorical" language to mean that the Title VII exemptions confer on religious organizations an immunity *from trial* on an employment-discrimination claim. That's much more than this passage in *Korte* can bear. We've noted on another occasion that "[w]ords like 'immunity,' sometimes conjoined with 'absolute,' are often used interchangeably with 'privilege,' … without meaning to resolve issues of [immediate] appealability." *Segni v. Commercial Office of Spain*, 816 F.2d 344, 346 (7th Cir. 1987) (quoting DAN B. DOBBS ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 114, at 815 (5th ed. 1984)). "[T]he description of a defense as an 'immunity' rather than a privilege or affirmative defense … does not resolve the issue whether the denial of the immunity is a collateral order." *Id.*

Without more, the passage the Diocese invokes from *Korte* is not enough to confer collateral-order status on a district court's decision rejecting a defense based on Title VII's exemptions for religious organizations. The Diocese cites no authority for the proposition that the exemptions provide an immunity from the burdens of trial rather than an ordinary defense to liability. To our knowledge, there is none.

The Diocese also argues that collateral-order review is necessary to avert a serious encroachment on its First

Amendment religious-liberty interests. This argument relies on *McCarthy v. Fuller*, 714 F.3d 971 (7th Cir. 2013). There we held that the conditions for a collateral-order appeal were satisfied when a district judge ordered that a religious question—whether the defendant Patricia Fuller was a nun in good standing in the Catholic Church—be submitted to a jury for decision. *Id.* at 973–74. The Holy See, the governing body of the Catholic Church, had issued a ruling on Fuller's status, and we explained that secular courts must accept that ruling as authoritative. *Id.* at 974. We pointed out that if the jury were to conclude that Fuller was a member of a Catholic religious order, the jury would "be rejecting the contrary ruling of the religious body (the Holy See) authorized by the Church to decide such matters." *Id.* For this reason, we held that the district court's decision was "closely akin to a denial of official immunity" and allowed a collateral-order appeal in order to vindicate the important religious-liberty principle that "[a] secular court may not take sides on issues of religious doctrine." *Id.* at 975.

The circumstances here are not comparable. The district court has not ordered a religious question submitted to the jury for decision. To the contrary, the judge promised to instruct the jury *not* to weigh or evaluate the Church's doctrine regarding in vitro fertilization.[1] The judge would do well to be quite explicit in these instructions. The pattern jury instructions can be adapted to the particular facts of a given case, and in light

---

[1] The Diocese does not seek collateral-order review of the district court's ruling regarding the ministerial exception.

of the sensitive context here, this case is an appropriate one for customized instructions.

We express no opinion on the merits of the district court's summary-judgment decision. We hold only that the Diocese has not made a persuasive case for expanding the scope of the collateral-order doctrine to cover the interlocutory decision rendered here. We do not question the importance of the interests the Diocese has asserted. But those interests will not be irreparably harmed by enforcement of the final-judgment rule. *See McCarthy*, 714 F.3d at 975 (explaining that "to be appealable as a collateral order the order must (unless reversed) wreak irreparable harm on the appellant"). Because the district court's decision is not effectively unreviewable on an appeal from a final judgment, the collateral-order doctrine does not apply. We grant Herx's motion and DISMISS the appeal for lack of jurisdiction.[2]

---

[2] The Diocese also filed a "Motion for Order Notifying District Court of Stay of District Court Proceedings Pending Appellate Court's Consideration of Defendants-Appellants' Appeal." Our jurisdictional dismissal of the appeal moots this motion.